**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>              **Plaintiff,**<br><br>**v.**<br><br>**BLAKE G. WILLIAMS,**<br>**TBECK CAPITAL, INC.,**<br>**WARREN STREET INVESTMENTS, INC.,**<br>**VICTORIA FINANCIAL CONSULTANTS, LLC,**<br>**BGW ENTERPRISES, INC.,**<br>**EMERGING RESOURCES, INC.**<br>**VALEK INVESTMENTS, INC.,**<br>**DEREK LOPEZ,   and**<br>**DA BIG KAHUNA, LLC,**<br><br>              **Defendants.** | **Civil Action No: 3:10-cv-1068** |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Plaintiff" or "Commission") alleges for its Complaint as follows:

**SUMMARY**

1.      Blake G. Williams, TBeck Capital, Inc., Warren Street Investments, Inc., Victoria Financial Consultants, LLC, BGW Enterprises, Inc., Emerging Resources, Inc., Valek Investments, Inc., Derek Lopez, and Da Big Kahuna, LLC engaged in a fraudulent scheme to sell stock in unregistered, non-exempt public offerings and to manipulate the markets for those stocks beginning in or about the middle of 2006 and continuing through at least 2008.

2.     The defendants' conduct was part of a pervasive fraudulent scheme involving the stocks of at least a dozen microcap issuers, whose stock often became worthless after the defendants ceased their market manipulation scheme.

3.     The scheme followed a similar pattern with each issuer.  Williams, TBeck, Warren Street, Victoria Financial, BGW, Emerging Resources, and Valek participated in a scheme to acquire control of publicly-traded shell companies.  Before a reverse merger transaction, whereby the public shell corporation acquired a privately held company effectively taking that company "public," the defendants received large blocks of shares in the public shell companies as part of illegal, unregistered offerings.  After the reverse mergers, all of the defendants, including Lopez and Da Big Kahuna, sold some of the shares of the newly formed public entity in unregistered offerings to investors via purported private placements and additional shares to investors through the markets.  The defendants' acquisitions and sales of these shares were illegal public distributions; none of the transactions were registered with the Commission, and none qualified for any exemption from registration.

4.     Williams maintained control of some of the shares that investors bought in the purported private placements and traded those shares as a pool for at least the first 30 days to limit the investors' ability to sell.  All of the defendants, including Lopez and Da Big Kahuna, further schemed to artificially support the stock prices of the issuers, after the reverse mergers, by engaging in a number of practices that supported the manipulation, including "bid support," trading in multiple accounts, coordinating trading, and controlling the float.  The defendants and others then traded in concert, taking advantage of the manipulated markets to sell their stock for significant profit.  The manipulation materially affected the market for these stocks and, after the manipulative activities ceased, most of the stocks became almost worthless for

the investors who still held the stocks.

5.      By engaging in the foregoing conduct, the defendants violated the registration

provisions of the federal securities laws, Sections 5(a) and 5(c) of the Securities Act of 1933

("Securities Act") [15 U.S.C. §§ 77e(a) and (c)], and the anti-fraud provisions of the federal

securities laws, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Exchange

Act Rule 10b-5 [17 C.F.R. § 240.10b-5].  Additionally, Blake Williams violated Section

15(a)(1) of the Exchange Act by acting as an unregistered broker.  [15 U.S.C. § 78o(a)(1)]

### JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a)

of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Venue is proper in this district

pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the

Exchange Act [15 U.S.C. § 78aa] because the defendants engaged in certain of the acts

complained of in this district.

7.      The defendants, directly and indirectly, have made use of the means

and instrumentalities of interstate commerce, the means and instruments of transportation and

communication in interstate commerce, and the mails, in connection with the acts, practices,

and courses of business set forth in this Complaint.

### DEFENDANTS

8.      **Blake Williams**, age 26, is a resident of Dallas, Texas.  Beginning in 2006 and

through at least 2008, Blake Williams became employed by TBeck Capital, Inc. and was its

corporate secretary.  Williams traded on behalf of and was an officer or director of each of the

entities listed below in paragraphs 9 through 14 (collectively the "Williams Entities"). Williams is not, nor has he ever been, registered with the Commission as a broker, dealer, investment advisor or in any other capacity.

9.     **TBeck Capital, Inc.** ("TBeck") is a Florida corporation with its principal place of business in Grapevine, Texas.  It purports to be an investment banking and corporate finance firm.  Williams is TBeck's Secretary and has trading authority for TBeck's brokerage accounts.

10.     **Warren Street Investments, Inc.** ("Warren Street") is a Nevada Corporation with its principal place of business during the relevant period in Grapevine, Texas.  During the relevant period, Williams was the corporate secretary and a director.  Williams has trading authority for at least some of Warren Street's brokerage accounts.

11.     **Victoria Financial Consultants, LLC** ("Victoria Financial") is a Texas corporation with its principal place of business during the relevant period in Grapevine, Texas. During the relevant period, Williams was a manager of the firm.  Williams has trading authority for Victoria Financial's brokerage accounts.

12.     **BGW Enterprises, Inc.** ("BGW Enterprises") is a Texas corporation; at the time of the relevant conduct its principal place of business was Grapevine, Texas, at TBeck's offices.  Williams is the sole director of BGW Enterprises and had sole trading authority for BGW Enterprises' brokerage accounts.

13.     **Emerging Resources, Inc.** ("Emerging Resources") is a Texas corporation with its principal place of business in Grapevine, Texas.  Williams is its sole director.

14.     **Valek Investments, Inc.** ("Valek Investments") is a Texas corporation with its principal place of business in Dallas, Texas at Williams's residence.  Williams is a director and, at all relevant times, had trading authority for Valek Investments' brokerage accounts.

15.     **Derek Lopez**, age 42, is a resident of Torrance, California.  Lopez is a registered representative with Newport Coast Securities and National Asset Management, Inc. and holds Series 6, 7, 63, and 65 licenses.  During the relevant period, Lopez worked for broker-dealers that were registered with the Commission, Brookstreet Securities Corporation and then National Securities Corporation.  Lopez was the registered representative on some of the brokerage accounts held by Williams and the Williams Entities.

16.     **Da Big Kahuna, LLC** ("Da Big Kahuna") is a California corporation with its principal place of business in Torrance, California.  During the relevant period, Derek Lopez conducted all business and trading on behalf of Da Big Kahuna.

### THE TARGETED ISSUERS

17.     **Advanced Growing Systems, Inc.** ("Advanced Growing") is a Nevada corporation with its principal place of business in Alpharetta, Georgia.  Its securities are registered with the Commission under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)]. Advanced Growing purports to manufacture and sell organic fertilizer.  Advanced Growing's securities are dually quoted on the OTC Bulletin Board and the Pink Sheets under the symbol "AGWS."

18.     **Axium Technologies, Inc.** ("Axium") is a Delaware corporation with its principal place of business in Pasadena, California.  Axium purports to be a provider of digital security systems.  Axium's securities are quoted on the Pink Sheets under the symbol "AXGI."

19.     **Bluefire Ethanol Fuels, Inc.** ("Bluefire") is a Nevada corporation with its principal place of business in Irvine, California.  Its securities are registered with the Commission under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].  Bluefire purports

to be a provider of technology for the conversion of bio-waste to ethanol. Bluefire's securities are dually quoted on the OTC Bulletin Board and the Pink Sheets under the symbol "BFRE."

20.    **Datascension, Inc.** ("Datascension") is a California corporation with is principal place of business in Brea, California. Its securities are registered with the Commission under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)]. Datascension purports to be a data gathering and research company in the U.S., Costa Rica, and the Dominican Republic. Datascension's securities are dually quoted on the OTC Bulletin Board and the Pink Sheets under the symbol "DSEN."

21.    **Interlink Global Corp.** ("Interlink") is a Florida corporation with its principal place of business in Miami, Florida. Interlink purports to be a provider of telecommunications and internet services. Interlink's stock is quoted on the Pink Sheets using the symbol "ILKG."

22.    **Medirect Latino, Inc.** ("Medirct Latino") was incorporated in Florida but was foreclosed upon by its lenders. Its principal place of business was in Ft. Lauderdale, Florida. Its securities were formerly registered with the Commission under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)] until the company voluntarily terminated its registration in September 2007. Medirect Latino purported to supply diabetic medical supplies to the Latino community. It formerly was quoted on the Pink Sheets under the symbol "MLTO."

23.    **National Automation Services, Inc.** ("NASV") is a Nevada corporation with its principal place of business in Henderson, Nevada. NASV purports to be run a network of automation and controls companies throughout the nation. Its stock is quoted on the Pink Sheets under the symbol "NASV."

24.    **Packaged Home Solutions, Inc.** ("Packaged Home") was a Florida corporation that abandoned its Cincinnati, Ohio offices in July 2007. Packaged Home purported to be a

design and remodeling company.  It formerly was quoted on the OTC Bulletin Board under the symbol "PKGH."

25.     **Pet Ecology Brands, Inc.** ("Pet Ecology") is a Texas corporation with its principal place of business in Dallas, Texas.  Pet Ecology purports to be a manufacturer of organic and fat-free pet products.  Its stock is quoted on the Pink Sheets under the symbol "PECD."

26.     **Remote Surveillance Technologies, Inc.** ("Remote Surveillance") is a Nevada corporation with its principal place of business in Irvine, California, and changed its name to Stratera, Inc. in July 2008.  The company purports to deliver security systems and services.  Its stock was quoted on the Pink Sheets under the symbol "RSUV" during the relevant time period.

27.     **Riverdale Oil and Gas Corporation**, ("Riverdale") is a Nevada corporation with its principal place of business in Austin, Texas.  The company purports to own and manage a number of oil wells.  Its stock is quoted on the Pink Sheets under the symbol "RVDO."

28.     **Straight Up Brands, Inc.** ("Straight Up") is a Delaware corporation based in New York, New York.  Straight Up purports to be a marketing firm for celebrity-branded wine and spirits.  It is quoted on the Pink Sheets under the symbol "STRU."

**FACTS**

I.     **THE FIRST STEP IN THE SCHEME: DEFENDANTS GAIN CONTROL OF THE ISSUERS AND ILLEGALLY DISTRIBUTE SECURITIES**

29.     As a first step in the scheme, the defendants gained control of the issuers and then illegally distributed securities among themselves.

30.     Williams and one or more of the Williams Entities participated in the unregistered distributions of shares related to at least eleven issuers (Advanced Growing, Axium, Bluefire Ethanol, Interlink Global, Medirect Latino, National Automation, Packaged Home, Pet Ecology, Remote Surveillance, Riverdale, and Straight Up).

31.     Lopez and Da Big Kahuna participated in the unregistered distribution of shares of Axium and Packaged Home.

    A.     **Company Formation and Acquisition of Shares**

32.     With respect to each issuer, the scheme began with TBeck or one of the other defendant Williams Entities ensuring that the targeted company merged into a public shell company that the defendants controlled.

33.     TBeck first entered a contract with a privately held issuer whereby TBeck would serve as a purported financial advisor to the company and would provide: a shell corporation ("Shell Company") that would permit the privately held issuer to become publicly traded; a capital investment; and marketing services to the privately held issuer in exchange for shares in the Shell Company's stock.

34.     Before completing a transaction in which the privately held issuer entered into a reverse merger transaction with the Shell Company, a controlling block of the Shell Company's shares were improperly issued without restrictive legends to Williams and/or a number of the Williams Entities. The Williams Entities provided to the transfer agent their

subscription agreements with the issuer, and attorney representation letters falsely stating the shares were exempt from registration under the Securities Act.  In most of the transactions, Williams completed the necessary paperwork and instructed the transfer agent to issue the stock certificates to himself and the Williams Entities.  These instructions relied upon false claims of exemption from the registration requirements of Section 5 of the Securities Act. [15 U.S.C. §§ 77e]

35.     Each privately held issuer then merged into the publicly traded Shell Corporation.

36.     As part the reverse merger, the owners of the private company generally received shares bearing restrictive legends, which prevented the owners from trading the shares immediately; this resulted in the Williams Entities controlling the majority of the post-merger public float (i.e., the total shares available for investors to trade in a particular stock).

37.     With respect to Advanced Growing, Axium, Remote Surveillance, National Automation, and Riverdale, Blake Williams served for a time as the corporate secretary for each of these publicly traded companies.

**B.     <u>Williams Entities Distribute Shares to Lopez and Others</u>**

38.     After the defendant Williams Entities received the shares without restrictive legends, they transferred the shares—without registering the offering—to other individuals and entities involved in the scheme, including Da Big Kahuna.

39.     For example, on December 14, 2006, Williams, on Victoria Financial letterhead and acting as a director of Victoria Financial, wrote to Axium's transfer agent instructing it to transfer 375,000 shares of Axium from Victoria Financial to Da Big Kahuna.  Williams instructed the transfer agent to issue seven certificates for 50,000 shares each and one

certificate for 25,000 shares.  After receiving falsely claimed exemptions contained in the materials supplied by Williams, the transfer agent subsequently issued the requested shares, which did not contain a restrictive legend.

40.     Similarly, in late February 2007, the Williams Entities transferred 270,000 shares of Packaged Home to Da Big Kahuna.  Pursuant to a letter written by counsel and provided to Lopez, the transferred shares did not contain a restrictive legend, although no exemption was claimed.

### C.     Defendants Sell Securities to Investors

41.     After distributing shares to others involved in the scheme, a number of individuals and entities, including Williams, then sold shares to investors, on the Williams Entities' behalf, through purported private placements.  The agreements were titled "[Issuer Name] Subscription Agreement," suggesting that the shares were being offered by the issuers.  In fact, the selling parties were Williams Entities, and checks were to be payable to one of the Williams Entities or one of its employees.

42.     Williams solicited purchasers through a number of methods, including email. Williams sent emails to contact lists that he developed, and provided materials and subscription agreements to potential investors.

43.     As part of these solicitations, Williams spoke to prospective buyers via telephone and email recommending, that they purchase the stocks that the Williams Entities were selling via subscription agreements.

44.     The Williams Entities also paid substantial commissions to parties who sold the subscriptions to investors.  These commissions were typically one half or one share of stock

per share sold and cash ranging from thirteen to fifty percent of the amount paid by subscribers.

45.     The Williams Entities failed to disclose such commissions to investors in the offering memoranda, subscription agreements, or in any other way.  They also did not disclose the criminal and regulatory histories of individuals who played key roles in offering the shares.  In addition, the defendants did not disclose that they controlled the stock's float and planned to coordinate manipulative trading, that the offerings were unregistered and had no available exemption from registration, or that, mostly likely, the stock prices would fall in the future when the defendants and others involved in the scheme sold their substantial holdings and ceased their manipulative trading.

46.     In at least one instance, Da Big Kahuna transferred 25,000 shares of Axium to an investor who had entered into a subscription agreement with one of the Williams Entities.

47.     Most shares bought in the "private placements" were controlled and traded as a pool by Williams for a period of approximately 30 to 60 days, and purchasers did not have access to their shares during this period.  When the pool was "broken," Williams distributed shares and cash, proportional to investors' initial investment.

48.     Williams regularly communicated with the buyers who owned stock in the pool, in one instance promising, "the stock price will increase considerably as the holidays end and our Investor Relations team go to work."

### D.     Defendants Dump Shares into the Market

49.     Some of the subscription agreements stated that the purpose of the pool was to "facilitate the early trading of the shares," but, instead, the pools facilitated the defendants' dumping of their shares into the market by giving them control over much of the stocks'

public float.  While investors' shares from the subscription agreements were locked up and being traded by Williams as a pool, the defendants sought to liquidate their shares in the market.

50.     While the investors in the subscription agreements' shares were locked up in the pool, and also following the dissolution of the pool, the defendants and others manipulated the markets for the securities to their own benefit.

51.     The defendants' sales in the market were not made pursuant to a registration statement, nor was an exemption to registration claimed or applicable.

## II.     THE SECOND STEP:  MARKET MANIPULATION

52.     After gaining control of a public company, having shares issued to themselves and distributing some of the shares to others, the defendants, in coordination with others, engaged in an effort aimed at stabilizing, maintaining, or increasing prices and liquidity so they and others could sell their holdings for substantial gains.

53.     Williams and the Williams Entities participated in the manipulation of the stocks of at least a dozen issuers (Advanced Growing, Axium, Bluefire, Datascension, Interlink, Medirect Latino, National Automation, Packaged Home, Pet Ecology, Remote Surveillance, Riverdale, and Straight Up).

54.     Lopez and Da Big Kahuna participated in the manipulation of at least eight stocks (Axium, Bluefire, Interlink, Packaged Home, Pet Ecology, Straight Up, National Automation, and Remote Surveillance).

55.     The defendants used a variety of methods to manipulate the markets for the targeted stocks including, "bid support," controlling the float, coordinated trading, and trading in multiple accounts.

A.      **Bid Support**

56.      The defendants and others engaged in what they referred to as "bid support." This conduct involved layering orders at or near the best bid and ask prices with the intent to stabilize or increase share prices.

57.      The defendants placed buy orders for stock at prices immediately below the "inside," or highest, bid price posted by the market makers.  For example, if the highest bid posted by a market maker was $1.50, the defendants might place orders at $1.45, $1.40, and $1.35, often for small amounts of stock.

58.      These orders had two purposes.  First, the defendants intended to create an artificial floor price for the stock when there was increased selling in the market; the defendants expected that the supporting orders would absorb some of the sell orders so that the stock prices would not fall dramatically.  Second, the defendants placed the orders through different brokerage firms so that market participants would see a substantial number of bids and conclude that there was greater demand for the stocks than truly existed.

B.      **Controlling the Float and Coordinating Trading**

59.      The overall manipulation strategy relied upon controlling the "float"—the total shares available for investors to trade for a particular stock.  As part of the scheme to distribute shares in unregistered offerings, the defendants and others ensured that the majority of shares without restrictive legends were controlled by the group.

60.      The defendants and other participants in the scheme controlled the float so that shares would not be "dumped" into the market indiscriminately while they were selling their shares into the market.

61.    As described above, the individuals who bought shares from the Williams Entities had their shares pooled for some initial period (typically 30 to 60 days) and Williams traded their shares during this lock-up period.

62.    The defendants and others engaged in coordinated trading to deceive the markets and extract profits from artificially high stock prices.  This was accomplished by, among other things, selling in times of increased volume and price and not selling in times of low prices and/or volume.

### C.    Trading in Multiple Accounts

63.    The defendants traded through several different brokerage firms using multiple accounts.  This practice gave the impression of market depth to those looking at the market on a "Level II" or "Level III" screen, which identifies the market makers that are originating bids.  Additionally, trading spread over many brokerage firms might avoid "red flags" with brokerage houses if large amounts of stock were deposited via stock certificates, thus concealing the fraud.

64.    Williams traded stock on behalf of the Williams Entities and in his own name through accounts at multiple brokerage firms.  Williams often deposited shares across the numerous accounts to avoid scrutiny and purportedly to ease the "clearing process."

65.    For instance, in the case of Axium, Williams directed the transfer agent to issue stock certificates to TBeck Capital, Victoria Financial, Valek Investments, Warren Street, and himself.  An email from another individual to Williams said, "distribute free trading stock to 3 brokerage firms.  Remember that the small cert[ificate]s go out first.  Don't send Lampost [Brokerage] any Victoria shares since they think I am on too many accounts."  Valek Investments' one million Axium shares were issued in twenty certificates of 50,000 shares

each.  As part of depositing these numerous certificates across all of the accounts, Williams told one of his brokers, "I thought I would deposit one 50,000 share cert[ificate] into each account to make sure y'all are comfortable before I drop the bigger ones in."

66.     Similarly, Lopez traded securities at both his employer and "away" from his employer (in accounts at other firms), and traded in both his own name and in the name of Da Big Kahuna.  Lopez made efforts to hide his activities on behalf of Da Big Kahuna from his employer by not properly designating them as "related" accounts.  Moreover, the accounts for Da Big Kahuna are listed in the name of one of Lopez's relatives even though Lopez controlled the trading in those accounts.

## D.   Effects of the Manipulation

67.     The manipulation materially affected the market for numerous stocks and, following the manipulation, most of the stocks became almost worthless.  Most of the stocks followed a trajectory in which they peaked in price on or about the opening and spiked intermittently throughout the scheme, though generally losing value overall.

## III.   DISTRIBUTION AND MANIPULATION OF THE STOCK OF AXIUM TECHNOLOGIES

68.     The distribution and manipulation of Axium stock is a representative example of the operation of the scheme.

69.     TBeck's President (Williams' father) and the president of the privately-owned Axium Technologies signed a Letter of Intent in September 2006 whereby TBeck would serve as a financial advisor to Axium and would provide the company with funds and marketing services in exchange for six million shares of stock.  In November 2006, the sole officer and director of a publicly traded shell company, Mekju Processing, Inc., resigned his positions and

TBeck's accountant then became president, sole director and officer of the shell and Blake

Williams became the secretary.  Mekju's name then was changed to Axium Technologies, Inc.,

the same name as the private entity with which the shell company would be merged.

70.     At the end of November 2006, the public shell and the privately-owned Axium

entered into a Stock Purchase Agreement and Plan of Organization whereby the privately-

owned company would be merged into the public shell.  Pursuant to that agreement, the owners

of the private company were to receive 14 million shares with restrictive legends representing

70% ownership of the new company, and TBeck and its partners were to receive six million

shares without restrictive legends representing 30% of the company, and would provide

financing to the new entity.

71.     On December 1, 2006, the Board of Directors of the shell company, through its

sole director (who was also TBeck's accountant), issued a resolution granting five million

shares as follows:  1,160,334 shares to TBeck Capital; 1,473,000 shares to Victoria Financial;

1,039,666 shares to Valek Investments; 1,277,000 shares to Warren Street Investments, and

50,000 shares to Blake Williams.  Blake Williams signed subscription agreements on behalf of

himself and Valek Investments dated December 1, 2006.  The shares were purportedly issued

under Rule 504 of Regulation D under the Securities Act.  [17 C.F.R. § 230.504]

72.     On or about November 30, 2006, TBeck's General Counsel, on TBeck

letterhead, signed a letter to Axium's transfer agent, regarding the issuance of five million

shares of "free trading common stock" of Axium to TBeck Capital, Victoria Financial, Valek

Investments, Warren Street Investments, and Blake Williams.  This letter asserted that the five

million shares were exempt from registration under Texas Securities Act, Section 7 pursuant to

Rule 109.4 of the Texas Blue Sky Regulations [7 Tex. Admin. Code § 109.4] and were exempt

from registration under Rule 504(b)(2) of the Securities Act. [17 C.F.R. § 230.504(b)(2)] However, contrary to the assertions in the letter, the sales did not qualify for the exemption.

73.     On or about December 4, 2006, Blake Williams provided the Axium board resolution, along with the November 30, 2006, letter from TBeck's General Counsel, and other documentation to Axium's transfer agent; Williams instructed the transfer agent to issue five million shares to himself and the Williams Entities in 27 stock certificates.  After receiving the materials supplied by Williams, which included falsely claimed exemptions, the transfer agent issued the 27 certificates without restrictive legends on or about December 5, 2006.

74.     The subsequent stages of the distribution—in which the defendants transferred blocks of shares to other parties, shares were sold in purported private placements pursuant to subscription agreements, and shares were sold in the market by the defendants—also should have been registered under the Securities Act.

75.     The subsequent distribution of Axium shares began with a private placement memorandum that Williams and others provided to potential investors.  The agreement was entitled, "Axium Technologies Subscription Agreement" even though the text indicated that Victoria Financial was the actual seller of the purportedly "free trading stock."

76.     The memorandum failed to disclose compensation paid to selling parties and the criminal and regulatory histories of key participants in the offering among other things.  For instance, the memorandum failed to disclose that one of the key participants, TBeck's president, twice pled guilty to separate conspiracies to defraud the IRS and was incarcerated by the state of Florida from 1998 to 2002 for securities fraud, boiler room sales, organized communications fraud, racketeering, and grand theft.  The memorandum also failed to disclose that another key participant, TBeck's accountant, was permanently enjoined in 2000 by the

Federal Trade Commission from making misrepresentations related to consumer liabilities for goods and services and from processing unauthorized charges on consumers' credit or debit cards.

77.     The memorandum instructed investors to write checks or wire funds directly to Victoria Financial.  More than 2.2 million shares owned by Williams Entities were sold via these private placements at prices ranging from $.75 to $1.25 per share.

78.     Williams personally solicited investor purchases of Axium shares, as well as shares of Bluefire, National Automation, Packaged Home, and Straight Up.

79.     Although most subscribers bought their Axium shares in November and December 2006, Williams controlled the shares in the pool and did not distribute any proceeds from the pool's trading until on or about December 22, 2006.  It was not until late January of 2007 that Williams began providing paperwork to Axium's transfer agent to transfer shares to the subscribers.  The shares were not completely distributed to subscribers until April 2007.

80.     Beginning in early December 2006, the defendants actively manipulated the market for Axium's stock in order to create and maintain artificially high share prices and create volume so they could dispose of their stock.

81.     On December 9, 2006, Axium's stock closed at $2.40, but by January 25, 2007, it had dropped substantially and closed at $1.30.  By January 31, 2007, the stock closed at $1.24 and by February 26, 2007, shares were trading at just $0.39.  Consequently, by the time any of the subscribing shareholders received their stock, the stock's price had dropped almost 50%, and, for some of the subscribers, the stock price had dropped more than 80%.

82.     In December 2006, while Williams controlled investor shares in the pool, the Williams Entities sold approximately 91,000 shares of Axium in the market.  In January 2007,

the Williams Entities sold more than 111,000 shares of Axium and in February 2007, they sold

more than 240,000 shares in the market.  Between January 2007 and April 2007, Lopez and Da

Big Kahuna traded Axium's stock, selling more than 56,000 share of Axium in the market

resulting in more than $28,000 in profits.

83.    The defendants also ensured that the float was controlled by others also

involved in the scheme.  Williams acknowledged control of the float in an email to Lopez and

others concerning Axium:  "I am writing this email to you as we several people represent

pretty much the only people with this kind of stock that could dominate a market like what

happened."

84.    Additionally, email communications detail coordination among Williams,

Lopez, and others in the trading of Axium's stock.  In January 2007, Williams sent an email to

the group:

> I'm writing this email as I received a lot of calls today, mostly from the people
> receiving this email, about the trading of [Axium] today.  For those of you who don't
> know, NITE today took a lot of volume between 1.15 and 1.25, mostly with a very
> large order at $1.20.  There was under-offering, the whole bit.  Volume today was 68k,
> should have ended at $1.40 minimum.  Instead, due to intense selling and under-
> offering by NITE, it ended at $1.24…  So, on behalf of the other six non-sellers, I ask
> you to please KNOCK IT OFF… for the sake of everyone else, let the volume drive the
> selling and not the other way around.

85.    Lopez responded to the group, "There were buyers all day and this stock should

of [sic] closed close to 2 bucks.  Instead whoever is selling is an f_in moron who's [sic] should

have moved up every 500 shares instead of parking their sell order."

86.    Lopez later sent an email to Williams and others complaining that someone was

continuing to sell Axium and telling them that "we need to come up with a solution for this

problem, because [Axium] is too good of a company to be trading at .45 and as we have seen in

the past we can't trust anyone, especially someone with zero loyalty or vested interest in the

team concept."  The next day Lopez suggested that the group ask the company for reports of shareholders to find the identity of the trader.

87.     The defendants also engaged in manipulative practices, including "bid support" to maintain artificially high prices.  For instance, Williams wrote in an email on February 22, 2007, that Axium ended its trading that day at $.51 and 125,000 shares trading because "someone killed [Axium] right off the bat, it went as low as $.38 before Derek and I saved it." That day, Axium's stock opened at $.57 and dropped to a low of $.38 before closing at $.51.

## IV.     THE SCOPE OF THE FRAUD

88.     The reverse merger, distribution, and trading scheme detailed above was repeated, with slight variation, for the other targeted issuers.  In each case, the defendants caused unregistered distributions and then manipulated the market, while dumping their shares.

Advanced Growing

89.     On or about June 17, 2006, the public shell of Advanced Growing issued 3.4 million shares of Advanced Growing stock to the Williams Entities, without a restrictive legend and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

90.     Williams, through Victoria Financial, sold at least 2.6 million shares of Advanced Growing stock through subscription agreements, at approximately $1 per share.

91.     Between July 2006 and February 2007, Williams and the Williams Entities traded Advanced Growing's stock, selling more than 500,000 shares in the market, resulting in more than $250,000 in profits.

92.     Williams and the Williams Entities, in coordination with others, manipulated the stock of Advanced Growing using the practices described above.

93.     For example, Williams wrote to others on October 6, 2006, "I was just wondering what type of support/ IR [investor relations] drive is going to go in the future to help support [Advanced Growing's] stock price. . . I had to buy some shares (200) right before market close to get it back to 1.10."

Axium

94.     On or about December 1, 2006, the public shell of Axium issued 5 million shares of Axium stock to Williams and the Williams Entities, without restrictive legends and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

95.     Williams and others, acting through Victoria Financial, sold approximately 2.2 million shares of Axium stock through subscription agreements at prices ranging from $.75 to $1.25 per share.

96.     Some of the subscription agreements referred to shares for a company called Transfer Orbit but investors were provided Axium shares.

97.     On or about April 19, 2007, Da Big Kahuna transferred 25,000 shares of Axium to a purchaser of the shares.

98.     Between December 2007 and June 2007, Williams and the Williams Entities traded Axium's stock, selling more than 900,000 shares of Axium in the market, resulting in more than $540,000 in profits.

99.     Between January 2007 and April 2007, Lopez and Da Big Kahuna traded Axium's stock, selling more than 56,000 share of Axium in the market resulting in more than $28,000 in profits.

Bluefire

100.    On or about June 22, 2006, the public shell of Bluefire issued four million Bluefire shares, without restrictive legends, to TBeck and Victoria Financial, without registering the offering or having an available exemption from the registration requirements of the Securities Act.

101.    Between approximately July 6 and July 17, 2006, Williams and others, acting through TBeck and Victoria Financial, transferred at least 3.8 million Bluefire shares to purchasers of subscriptions and others.

102.     Between approximately July and November 2006, Williams and the Williams Entities traded Bluefire's stock, selling over 670,000 shares of Bluefire in the market, resulting in more than $1.3 million in profits.

103.    Between November 2006 and January 2007, Lopez and Da Big Kahuna traded Bluefire's stock, selling almost 10,000 shares and resulting in more than $28,000 in profits.

104.    The defendants acted in coordination to manipulate the stock of Bluefire using the practices described above.

105.    For instance, on November 3, 2006, another individual emailed Lopez, Williams, and others, telling them to "hold [Bluefire] until Nov 22nd. . . I expect the stock to pop to over $5 at that time."

Datascension

106.    On or about April 25, 2006, TBeck received 1 million shares of Datascension without a restrictive legend and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

107.    Between April 2006 and September 2007, Williams and the Williams Entities traded Datascension's stock, selling more than 500,000 shares of Datascension in the market.

108.    Williams and the Williams Entities, in coordination with others, manipulated the stock of Datascension using the practices described above.

109.    For instance, on July 31, 2007, another TBeck officer directed Williams to "start selling [Datascension] when it hits your account since we have no direct investors in this. Don't kill it but aggressively sell it."

Interlink

110.    On or about June 27, 2005, Interlink issued 600,000 shares of its stock to Victoria Financial, without a restrictive legend and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

111.    On or about September 12, 2005, Interlink issued 300,000 shares of its stock to Victoria Financial, without a restrictive legend and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

112.    On or about October 28, 2005, Interlink issued 430,000 shares of its stock to Victoria Financial, without a restrictive legend and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

113.    These initial distributions of shares, without restrictive legends, of Interlink preceded Williams's employment with TBeck Capital.

114.    Between March 15, 2005 and November 30, 2007, Williams and the Williams Entities traded Interlink's stock, selling more than 1.5 million shares of Interlink in the market, resulting in more than $900,000 in profits.

115.    On August 10, 2006, Lopez sold 20,000 shares of Interlink's stock, resulting in more than $20,000 in profits.

116.    The defendants, in coordination with others, manipulated the stock of Interlink using the practices described above.

117.    For instance, On October 4, 2006, another individual who was coordinating trading with the defendants told Williams and others, "On [Interlink], you should hit any bid at $1.50 or better. . . I can work with Blake on it if you want."

Medirect Latino

118.    The initial distributions of shares, without restrictive legends, of Medirect Latino preceded Williams's employment with TBeck Capital.  Rather than the Texas Blue Sky Laws, the Medirect Latino offering relied upon Section 1145 of the Federal Bankruptcy Code [11 U.S.C. § 1145]  which exempts from registration securities issued by a debtor under a plan of bankruptcy.

119.    Medirect Latino's predecessor shell filed bankruptcy in 1998 and was discharged in 2000; consequently, there was no viable link to the six-year-old terminated bankruptcy of a predecessor entity.

120.    On or about April 18, 2005, Medirect Latino issued 350,000 of its shares, to TBeck Capital, without a restrictive legend and without registering the offering or having an available exemption from registration under the Securities Act.

121.    On or about April 27, 2005, Medirect Latino issued 300,000 of its shares to TBeck Capital, without a restrictive legend and without registering the offering or having an available exemption from registration under the Securities Act.

122.    On or about May 3, 2005, Medirect Latino issued 300,000 of its shares, without a restrictive legend, to TBeck Capital, without a restrictive legend and without registering the offering or having an available exemption from registration under the Securities Act.

123.    Between May 2005 and November 2007, Williams and the Williams Entities traded Medirect Latino's stock, selling at least 870,000 in the market, resulting in more than $2.7 million in profits.

124.    Williams and the Williams Entities, in coordination with others, manipulated the stock of Medirect Latino using the practices described above.

125.    For example, on October 18, 2006, another individual wrote to Williams and others involved in the coordinated trading and told them, "The strategy today on [Medirect] is to consolidate our gains made yesterday.  Please stack up bids for the stock in the $3.20 to $3.30 level.  If we can hold this level, then we will push it up tomorrow."

126.    On that day, Medirect Latino stock rose from $3.41 to close at $3.80, more than an 11% increase.

National Automation

127.    Some investors signed subscription agreements for shares of ISE, ISL, and ISS (Intuitive System Solutions, Inc.) but received shares of National Automation.

128.    On or about February 4, 2007, National Automation's public shell issued approximately 14 million of its shares to the Williams entities and others, without restrictive legends and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

129.    Williams, acting through Emerging Resources, sold more than 210,000 shares through subscription agreements at prices ranging from $.50 to $.60 per share in late 2007.

130.    Williams, and others, acting through Victoria Financial, sold more than 3.5 million shares through subscription agreements at prices ranging from $.15 to $1 per share.

131.    Between October 2007 and May 2008, Williams and the Williams Entities traded National Automation's stock, selling more than 800,000 NASV shares in the market resulting in more than $1,600,000 in profits.

132.    The defendants acted in concert to manipulate the stock of National Automation using the practices described above.

133.    For instance, on May 20, 2007, Lopez wrote to Williams and others regarding their coordination on National Automation, "You need both volume and price … the better the volume the better the stock will trade over the long run.  Big volume will allow the sellers to get out early… My goal is big volume immediately to provide this early… I think you need to review this with all players."

Packaged Home

134.    On or about October 6, 2006, Packaged Home issued more than 3.4 million shares of its stock to the Williams Entities, without a restrictive legend and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

135.    Victoria Financial sold more than 1.9 million shares of Packaged Home stock through subscription agreements at prices ranging from $1 to $1.25 per share.

136.    Between October 2006 and July 2007, Williams and the Williams Entities traded Packaged Home's stock, selling more than 740,000 shares in the market.

137.    Between October 2005 and June 2007, Lopez and Da Big Kahuna traded in Packaged Home's stock, selling more than 22,000 shares for approximately $2,000 in profits.

138.    The defendants manipulated the stock of Packaged Home using the practices described above.

139.    For example, on or about January 17, 2007, another individual told Williams and Lopez in an email "see if you can get me a little support on [Packaged Home] today based upon the press release.  Want to try to close at $1.75."  Later that day, Lopez bought 1,000 shares of Packaged Home at $1.55.  Although the stock did not rise to $1.75, it rose from $1.50 to $1.55 and held that price for the next two days.

140.    Similarly, on January 17, 2007, that individual told Williams to "[b]id 5,000 shares for [Packaged Home] at $[1].50.  If you don't buy any by noon go to $[1].55 and then to $[1].60."  TBeck Capital bought 2,000 shares at $1.585 and Williams replied to that email stating, "bought, rallied the troops to help tomorrow."

Pet Ecology

141.    On or about July 19, 2005, Pet Ecology issued 1,428,572 shares to Victoria Financial without restrictive legend and without registering the offering or having an available exemption from registration under the Securities Act.

142.    On or about July 28, 2005, Pet Ecology issued 714,286 shares to Warren Street without a restrictive legend and without registering the offering or having an available exemption from registration under the Securities Act.

143.    On or about November 22, 2005, Pet Ecology issued 714,286 shares to Victoria Financial and 714,000 shares TBeck, without a restrictive legend and without registering the offering or having an available exemption from registration under the Securities Act.

144.     On or about November 28, 2005, Pet Ecology issued 1,428,572 shares to Victoria Financial without restrictive legend and without registering the offering or having an available exemption from registration under the Securities Act.

145.     On or about August 18, 2006, Pet Ecology issued 1,666,667 shares of its stock to TBeck, without restrictive legend and without registering the offering or having an available exemption from the registration requirements of the Securities Act.

146.     Warren Street sold more than 2 million shares of Pet Ecology stock through subscription agreements at prices ranging from $.18 to $.25 per share.

147.     This initial distribution of shares preceded Williams's employment with TBeck Capital.

148.     Between October 2005 and January 2007, Williams and the Williams Entities traded Pet Ecology's stock, selling more than 12 million shares of Pet Ecology in the market, resulting in more than $2.9 million in profits.

149.     Between October 2006 and January 2007, Lopez traded in Pet Ecology's stock, selling more than 25,000 shares.

150.     The defendants manipulated the stock of Pet Ecology using the practices described above.

Remote Surveillance

151.   On or about December 26, 2006, Remote Surveillance issued 9.1 million shares of its stock to Williams and the Williams Entities, without restrictive legend and without registering the offering or having an available exemption from registration under the Securities Act.

152.   The Williams Entities sold more than 3 million shares of Remote Surveillance to investors through subscription agreements at pricing ranging between $.10 and $.125 per share.

153.   Between January 2007 and September 2007, Williams and the Williams Entities traded Remote Surveillance's stock, selling more than 500,000 shares of Remote Surveillance in the market resulting in more than $455,000 in profits.

154.   Between January and May 2007, Lopez, through Da Big Kahuna, traded in Remote Surveillance's stock, selling more than 385,000 shares, resulting in profits in excess of $26,000.

155.   The defendants manipulated the stock of Remote Surveillance using the practices described above.

156.   For instance, an email from another individual to Lopez and Williams lays out a "schedule" for support bids in the stock of Remote Surveillance for trading on January 16, 2007: "50,000 shares at $.24[;] 10,000 at $.26[;] 25,000 at $.28[;] 25,000 at $.30[;] 25,000 at $.32[;] 25,000 at $.34[.]  Don't show more than three positions at a time.  I will make sure that this does not get away from us.  We will need to be in touch tomorrow to see when we need to get heavier and where we need to lighten up."

157.     On that trading day, January 16, 2007, Remote Surveillance's stock rose to $.30 from $.22 the day before (January 15) and from $.18 the week before (January 9).  Shares remained at $.29 the rest of the week of January 16.

Riverdale

158.     On or about February 11, 2007, Riverdale issued approximately 1.7 million shares of its stock to the Williams Entities without registering the offering or having an available exemption from registration under the Securities Act.

159.     Victoria Financial sold more than 30,000 shares of Riverdale to investors through subscription agreements at prices ranging from $.60 to $.75 per share.

160.     Between May and August of 2007, Williams and the Williams Entities traded Riverdale's stock, selling more than 3 million shares, resulting in profits of $1.6 million.

161.     Williams and the Williams Entities, in coordination with others, manipulated the stock of Riverdale using the practices described above.

162.     A May 2, 2007 email with the subject line "RVDO Trading" from another individual who was involved in the coordinated trading told others, including Williams, "explained the problem to him on stacking bids since Blake and I were the only bidders.  We will raise the bid today."

Straight Up

163.     On or about May 17, 2006, the public shell of Straight Up issued more than 2.8 million shares of its stock, to the Williams Entities, without a restrictive legend and  without registering the offering or having an available exemption from the registration requirements of the Securities Act.

164.    Victoria Financial sold more than 1 million shares of Straight Up to investors through subscription agreements at $1 per share.  The agreements referred to shares of the shell company that became Straight Up, Royal Pet Meals.

165.    Between August 2006 and June 2007, Williams and the Williams Entities traded Straight Up's stock, selling more than 2 million shares of Straight Up in the market, resulting in more than $400,000 in profits.

166.    Between August 2006 and September 2007, Lopez traded Straight Up's stock, buying more than 97,000 shares.

167.    The defendants manipulated the stock of Straight Up using the practices described above.

168.    Blake Williams told a prospective Straight Up investor, on August 24, 2006, that Straight Up opened that day with good volume, but "we couldn't raise th[e] open to $1.75/2."

169.    In addition, trading was coordinated through an October 10, 2006 email from another individual to Williams and Lopez stating, "it is important that we close at the ask and not at the bid on STRU.  Please get this coordinated."  Later that day, Lopez bought 250 shares of Straight Up's stock.

**FIRST CLAIM**
**(Against all Defendants)**
**Offer or Sale of Unregistered Securities**
**Violations of Securities Act Sections 5(a) and 5(c)**

170.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 170 above.

171.    As described above, defendants:  (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use

or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried and/or cause to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; or (c) made us of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

172.    No valid registration was filed or in effect with the Commission pursuant to the Securities Act and no exemption existed with respect to the securities and transactions described in this complaint.

173.    By engaging in the foregoing conduct, Defendants violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

### SECOND CLAIM
### (Against all Defendants)
### Securities Fraud
### Violations of Securities Act Section 17(a)

174.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 170 above.

175.    Defendants directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of the aforementioned securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have each: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of the securities.

176.    By engaging in the conduct alleged above, Defendants violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## THIRD CLAIM
### (Against all Defendants)
### Securities Fraud
### Violations of Exchange Act Section 10(b)
### and Exchange Act Rule 10b-5 thereunder

177.    The Commission realleges and incorporates by reference Paragraphs 1 through 170 of this Complaint as if fully set forth herein.

178.    Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly or recklessly:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

179.    By engaging in the conduct alleged above, the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**FOURTH CLAIM**
**(Against Blake Williams)**
**Unregistered Broker or Dealer**
**Violations of Exchange Act Section 15(a)**

180.    The Commission realleges and incorporates by reference Paragraphs 1 through 170 of this Complaint as if fully set forth herein.

181.    Blake Williams made use of the means and instrumentalities of interstate commerce and of the mails to effect, induce, and attempt to induct the purchase and sale of securities without being registered with the Commission as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(a)] and when no exemption from registration was available.

182.    Among other things, Williams contacted customers to solicit purchases of securities, made stock recommendations, traded securities in a pool on behalf of investors.

183.    By engaging in the conduct alleged above, Williams violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully prays that this Court:

(a)  pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] and

Section 20(b) of the Securities Act [15 U.S.C. §§ 77t(b)], permanently enjoin

Defendants from violating Section 5(a), 5(c), and 17(a) of the Securities Act and

[15 U.S.C. §§ 77e(a), (c), and 77q(a)] and Section 10(b) of the Exchange Act [15

U.S.C. §§ 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

(b)  pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)],

permanently enjoin defendant Blake Williams from violating Section 15(a) of the

Exchange Act [15 U.S.C. §§ 78o(a)];

(c)  pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and

Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], permanently and

unconditionally prohibit defendant Blake Williams from acting as an officer or

director of any issuer having a class of securities registered with the Commission

pursuant to Section 12 of Exchange Act [15 U.S.C. §78l] or that is required to file

reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

(d)  pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] and

Section 20(g) of the Securities Act [15 U.S. C. § 77t(g)], prohibit Defendants from

participating in an offering of penny stock as defined by Exchange Act Section

3(a)(51) [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R.

§ 240.3a51-1];

(e)  order Defendants to disgorge, with prejudgment interest, all ill-gotten gains,

compensation, and benefits by virtue of the conduct alleged herein;

(f)  pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act

Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], order Defendants to pay civil money

penalties; and

(g)  grant such other relief as the Court may deem just and appropriate.


Dated: May 27, 2010

Respectfully submitted,

____/s/ David Williams_____
David Williams (California Bar No. 183854)
Antonia Chion
Daniel Chaudoin
Robert A. Cohen
Pamela Kesner (Texas Bar No. 24036896)

SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549
Tel:  202 551-4548(Williams)
Fax:  202 772-9246(Williams)
E-mail:  WilliamsDav@sec.gov

Attorneys for Plaintiff